UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


IN RE:

Plastech Engineered Products, Inc., et al.[1]                    Case No. 08-42417
                                                                  Chapter 11
                              Debtors.                            Hon. Phillip J. Shefferly

                                                                  Jointly Administered

_____/

H.S. Die & Engineering, Inc.,

                              Plaintiff,

v.                                                                Adv. Pro. No. 09-4815

Ford Motor Company,

                              Defendant.

_____/


**OPINION DENYING DEFENDANT'S MOTION TO DISMISS**

I. Introduction

        This opinion addresses a motion to dismiss this adversary proceeding.  The adversary

proceeding was filed by the Plaintiff, H.S. Die & Engineering, Inc. ("H.S. Die") to enforce lien

rights that it asserts in certain tooling that it manufactured for the Debtor to use in its manufacture

of component parts for sale in the automotive industry.  The Defendant, Ford Motor Company

("Ford"), denies that H.S. Die has any lien rights in the tooling.  In addition to seeking to enforce

_____

        [1] The Debtors are the following entities: Plastech Engineered Products, Inc., LDM
Technologies, Inc., Plastech Frenchtown, Inc., Plastech Decorating Systems, Inc., Plastech
Exterior Systems, Inc., Plastech Romulus, Inc., MBS Polymet, Inc., LDM Holding Canada, Inc.
and LDM Holding Mexico, Inc.

lien rights in the tooling, H.S. Die also seeks a money judgment against Ford in this adversary proceeding for a sum that H.S. Die asserts is owed to it by Ford under a prior order of this Court and another sum under an unjust enrichment theory. Ford has moved to dismiss this adversary proceeding. For the reasons set forth in this opinion, the Court has determined to deny Ford's motion.

## II. <u>Jurisdiction</u>

The Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(a) and 157(a). This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (B) and (K).

## III. <u>Facts</u>

On February 1, 2008, Plastech Engineered Products, Inc. and a number of related entities filed for relief under Chapter 11 of the Bankruptcy Code. (Plastech and its related entities are collectively referred to as the "Debtor.") The Debtor was engaged in business as a tier 1 automotive supplier, designer and maker of blow-molded and injected-molded plastic parts. As of the petition date, the Debtor had annual sales in excess of $1.2 billion. The Debtor had numerous manufacturing facilities in North America, employed thousands of individuals, and had thousands of creditors. The Debtor's products included automotive interior trim, under hood components, bumper and other exterior components and interior components. The Debtor's customers included General Motors, Ford, Chrysler and Johnson Controls. In order to manufacture its parts, the Debtor, like other automotive suppliers, contracted to purchase various types of tooling from tooling manufacturers, including H.S. Die. H.S. Die manufactured and supplied the Debtor with tools, dies and molds for use by the Debtor in its production of parts for certain original equipment manufacturers, including Ford.

After filing the bankruptcy case, the Debtor continued its business operations and entered into negotiations to sell its business operations in one or more units.  The Debtor marketed for sale as business enterprises its interior business and exterior business, which together made up most of the Debtor's business, as well as its other business assets and operations.  The Debtor was successful in finding purchasers for the interior business and the exterior business.  On June 19, 2008, the Court entered an order (docket entry #1837) approving the sale of the Debtor's interior business.  On June 23, 2008, the Court entered an order (docket entry #1920) approving the sale of the Debtor's exterior business.  Together, these two orders approved the sale of substantially all of the Debtor's business assets.  The sale orders each provided that the Debtor was authorized and directed to sell its assets under § 363(f) of the Bankruptcy Code free and clear of all liens, claims and encumbrances, with all liens, claims and encumbrances attaching to the proceeds of sale with the same validity, extent and priority as they had immediately prior to the sale transactions, subject to any rights, claims and defenses of the Debtor and other parties interest.  However, to protect creditors such as H.S. Die, the sale orders contained very specific provisions regarding manufacturers of tooling used by the Debtor.  Paragraph 21.a. of the sale order entered on June 19, 2008, contained the following provision:

> To the extent that any vendor, maker, producer, manufacturer, fabricator, modifier or repairer of test fixtures, assembly fixtures, gauges, jigs, patterns, casting patterns, dies, molds, secondary equipment and related items, including but not limited to the definitions set forth in the Michigan Special Tools Lien Act, M.C.L. § 507.541, et seq. and the Michigan Ownership Rights in Dies, Molds and Forms Act, M.C.L. § 445.611, et seq. (the "Tooling") including vendors utilizing the Tooling in the production of component parts (collectively, the "Tooling Vendors" and each a "Tooling Vendor"), has or has asserted a valid, properly perfected and secured lien against Tooling, whether statutory liens, artisans' liens or possessory liens against the Tooling (the "Asserted Tooling Liens"), the Tooling is not part of the Acquired Assets, and the Tooling is not being sold pursuant to this Order.  Notwithstanding any transfer of possession of the Tooling to Buyer pursuant to this

Order, the Tooling shall remain subject to the Asserted Tooling Liens of the Tooling Vendors. This Order shall not affect or diminish the rights of the Tooling Vendors which have possession of Tooling or any right to continued possession.

Paragraph (23)(a) of the sale order entered on June 23, 2008 contained a virtually identical provision.

After the sale orders were entered and the sales were closed, the Court entered a separate order ("Tooling Procedures Order") on August 13, 2008 (docket entry #2500), which established certain procedures for the resolution of tooling claims and for the payment of tooling vendors with respect to the tooling transferred by the Debtor to the purchasers under the sale orders. Both the sale orders and the Tooling Procedures Order made it clear that the rights of the tooling vendors were unimpaired by the sales. Further, the Tooling Procedures Order set forth alternative procedures to resolve claims and liens asserted by the tooling vendors in the tooling they manufactured that was used by the Debtor and transferred to the purchasers under the sale orders.

On September 10, 2008, H.S. Die provided Ford with its Notice of Election-Delivered Tooling Payment Procedures in accordance with the Tooling Procedures Order. The Notice of Election informed the Debtor and Ford that H.S. Die elected to proceed under the Tooling Procedures Order with respect to tooling that H.S. Die had delivered to the Debtor pre-petition for the ultimate benefit of Ford but for which the Debtor had not paid H.S. Die. The Notice of Election was accompanied by a spreadsheet, invoices, purchase orders and other documents to support H.S. Die's claim for $3,707,154 in unpaid invoices for tooling ultimately benefitting Ford. On February 20, 2009, Ford, H.S. Die and the liquidating trustee for the Debtor entered into a stipulation concerning certain undisputed amounts owed by the Debtor to H.S. Die for which Ford had not previously paid the Debtor (docket entry #4491) (the "Ford Payment Stipulation"). The Court then

entered an order ("Ford Payment Order") (docket entry #4496) approving the Ford Payment Stipulation. The Ford Payment Order required Ford to pay H.S. Die $1,957,852. Ford paid that sum. However, the Ford Payment Order also required Ford to investigate whether any additional amounts were due and owing by Ford to H.S. Die for tooling made by H.S. Die for the Debtor to make component parts for Ford, and set a deadline to conclude that investigation.

On May 14, 2009, H.S. Die commenced this adversary proceeding against Ford. The adversary proceeding contains five separate counts. In count I, H.S. Die seeks to foreclose upon certain tooling under the Michigan Ownership Rights and Dies, Molds and Forms Act, Mich. Comp. Laws Ann. § 445.611, et. seq. ("Moldbuilders Lien Act"). In count II, H.S. Die seeks to foreclose upon certain tooling under the Michigan Special Tools Lien Act, Mich. Comp. Laws Ann. § 570.541, et. seq. ("Special Tools Lien Act"). In count III, H.S. Die seeks immediate possession of the tooling that H.S. Die manufactured for the Debtor, and for which H.S. Die has not yet been paid. In count IV, H.S. Die asserts that Ford has failed to comply with the Ford Payment Order and, specifically, seeks the entry of a money judgment against Ford under the Ford Payment Order in an amount not less than $523,446 but not more than $1,659,552. Finally, in count V, H.S. Die seeks a judgment determining that Ford has been unjustly enriched and awarding H.S. Die the sum of $1,659,552. Ford has moved that the complaint be dismissed in its entirety for failure to state a claim upon which relief may be granted.

IV.  Rule 12(b)(6) Standard

Fed. R. Civ. P. 8(a)(2), incorporated by Fed. R. Bankr. P. 7008(a), requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief[.]" The purpose of this pleading standard is "to give the defendant fair notice of what the . . . claim is and

the grounds upon which it rests." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007) (citations omitted).

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949 (2009) (quoting Twombly, 550 U.S. at 570). In deciding a motion to dismiss for failure to state a claim upon which relief may be granted, "[t]he court must construe the complaint in the light most favorable to the plaintiff, [and] accept all the factual allegations as true . . . . A court may not grant a Rule 12(b)(6) motion based on disbelief of a complaint's factual allegations." Bovee v. Coopers & Lybrand C.P.A., 272 F.3d 356, 360 (6th Cir. 2001) (citations omitted).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 129 S.Ct. at 1949 (citing Twombly, 550 U.S. at 556). "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 555 (citations omitted).

Before turning to the substance of Ford's motion under Rule 12(b)(6), there is one procedural matter that must be addressed. Ford filed its motion to dismiss and an answer and affirmative defenses. Ford attached copies of several documents to its motion that are not part of the pleadings. In footnote 2 of its brief in support of its motion, Ford argues that the Court may consider the financing statements attached as exhibits to its motion because they were "referenced in and included as part of the complaint." Paragraphs 38 and 48 of the complaint do reference the financing statements, but they were not incorporated or otherwise "included as part of the complaint."

Rule 12(b)(6) provides that, if "matters outside the pleadings are presented to and not excluded by the Court, the motion shall be treated as one for summary judgment" under Rule 56. All parties must "be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56." The conversion of a Rule 12(b)(6) motion to a Rule 56 motion "should be exercised with great caution and attention to the parties' procedural rights." Tackett v. M & G Polymers, USA, LLC, 561 F.3d 478, 487 (6th Cir. 2009) (internal quotation marks and citation omitted); see also Peckmann v. Thompson, 966 F.2d 295, 297-98 (7th Cir. 1992) (explaining that a *sua sponte* conversion from Rule 12(b)(6) to Rule 56 is permissible but hazardous, and "warrants special caution" because a motion for summary judgment looks behind the pleadings to the proof to determine the existence of disputed factual issues, and conversion may deprive the non-moving party of the opportunity to be heard on such factual issues). The Court declines to treat Ford's motion as a summary judgment motion under Rule 56. The Court will limit its consideration of Ford's motion to dismiss to the pleadings.

## V. Dismissal of Counts I - III

Counts I through III of the complaint base their request for relief upon application of two Michigan statutes regarding tooling: the Moldbuilders Lien Act and the Special Tools Lien Act. The Moldbuilders Lien Act applies to dies, molds, or forms used in the manufacture, assembly or fabrication of plastic parts. The Special Tools Lien Act applies to any tools, dies, jigs, gauges, gauging fixtures, special machinery, cutting tools or metal castings used to design, develop, manufacture, assemble or fabricate a metal product. The Moldbuilders Lien Act was first enacted in 1981 and provided a possessory lien for mold makers covered by the act. On March 1, 2002, the Moldbuilders Lien Act was amended to provide new and expanded rights for mold makers covered

by that act. Later the same year, the Michigan legislature granted similar rights to the metal fabrication industry by enacting the Special Tools Lien Act. The statutory language of the Special Tools Lien Act mirrors the language of the Moldbuilders Lien Act except for its definitional provisions. H.S. Die asserts liens on various tooling under both of these acts.

Ford argues that counts I through III of H.S. Die's complaint must be dismissed because they fail to state a claim under each of these acts. Specifically, Ford argues that a moldbuilder or special tool builder may only assert a lien under these statutes if it has taken two required steps under each of these statues. First, it must permanently record on every mold or tool, its name, street address, city and state. Second, it must file a financing statement in accordance with § 9-502 of the Uniform Commercial Code ("UCC"). In its motion to dismiss, Ford does not allege that H.S. Die failed to permanently record its name, street address, city and state on each mold and special tool. Instead, Ford contends that H.S. Die does not have an enforceable lien under either of these statutes because the financing statements that it filed were deficient because they either failed to state the correct name of the debtor, or were filed in the name of an entity that had already dissolved, or were filed post-petition in violation of the automatic stay of § 362 of the Bankruptcy Code. H.S. Die contends that its financing statements were not deficient, but even if they were, the filing of a financing statement is not required for it to have an enforceable lien on tooling under the Moldbuilders Lien Act or the Special Tools Lien Act.

As noted above, the Moldbuilders Lien Act and the Special Tools Lien Act have virtually identical provisions. Under the Moldbuilders Lien Act, § 445.619 creates the lien. Section 570.563 of the Special Tools Lien Act is the provision that creates the lien under that act. The only difference is that the former refers to builders of molds for plastic parts and the latter refers to

-8-

builders of special tools for metal products.  The Moldbuilders Lien Act § 445.619 reads as follows:

 (1) A moldbuilder shall permanently record on every die, mold, or form that the moldbuilder fabricates, repairs, or modifies the moldbuilder's name, street address, city and state.

 (2) A moldbuilder shall file a financing statement in accordance with the requirements of section 9502 of the uniform commercial code, 1962 PA 174, MCL 440.9502.

 (3) A moldbuilder has a lien on any die, mold, or form identified pursuant to subsection (1).  The amount of the lien is the amount that a customer or molder owes the moldbuilder for the fabrication, repair, or modification of the die, mold, or form. The information that the moldbuilder is required to record on the die, mold, or form under subsection (1) and the financing statement required under subsection (2) shall constitute actual and constructive notice of the moldbuilder's lien on the die, mold, or form.

 (4) The moldbuilder's lien attaches when actual or constructive notice is received.  The moldbuilder retains the lien that attaches under this section even if the moldbuilder is not in physical possession of the die, mold, or form for which the lien is claimed.

 (5) The lien remains valid until the first of the following events takes place:
 (a) The moldbuilder is paid the amount owed by the customer or molder.
 (b) The customer receives a verified statement from the molder that the molder has paid the amount for which the lien is claimed.
 (c) The financing statement is terminated.

 (6) The priority of a lien created under this act on the same die, mold, or form shall be determined by the time the lien attaches.  The first lien to attach shall have priority over liens that attach subsequent to the first lien.


The companion provision of the Special Tools Lien Act, § 570.563, reads as follows:

 (1) A special tool builder shall permanently record on every special tool that the special tool builder fabricates, repairs, or modifies the special tool builder's name, street address, city and state.

 (2) A special tool builder shall file a financing statement in accordance with the requirements of section 9502 of the uniform and [sic] commercial code, 1962 PA 174, MCL 440.9502.

(3) A special tool builder has a lien on any special tool identified pursuant to subsection (1).  The amount of the lien is the amount that a customer or end user owes the special tool builder for the fabrication, repair, or modification of the special tool.  The information that the special tool builder is required to record on the special tool under subsection (1) and the financing statement required under subsection (2) shall constitute actual and constructive notice of the special tool builder's lien on the special tool.

(4) The special tool builder's lien attaches when actual or constructive notice is received.  The special tool builder retains the lien that attaches under this section even if the special tool builder is not in physical possession of the special tool for which the lien is claimed.

(5) The lien remains valid until the first of the following events takes place:
(a) The special tool builder is paid the amount owed by the customer or end user.
(b) The customer receives a verified statement from the end user that the end user has paid the amount for which the lien is claimed.
(c) The financing statement is terminated.

(6) The priority of a lien created under this act on a special tool shall be determined by the time the lien attaches.  The first lien to attach shall have priority over liens that attach subsequent to the first lien.

To summarize, subsection 1 of both statutes requires the permanent recording of identification information on the tooling itself.  Subsection 2 requires the filing of a financing statement.  Subsection 3 provides that the moldbuilder or special tool builder "has" a lien on molds or tools identified under subsection 1.  Subsection 3 goes on to state that the permanent recording of identification information and the filing of a financing statement constitute actual and constructive notice.  Subsection 4 addresses attachment and retention of the lien.  Subsection 5 governs the validity of a lien.  And, finally, subsection 6 establishes the priority of liens, based on the time of attachment.

The dispute between Ford and H.S. Die arises from subsections 3 and 4.  Subsection 3 begins by stating that the moldbuilder or tool builder "has a lien" on any tool "identified pursuant to

-10-

subsection (1)."  By negative implication, recording the information under subsection 1 *by itself* seems to be sufficient under subsection 3 for the moldbuilder or tool builder to *have* a lien.  This is H.S. Die's position, that the lien is granted so long as the moldbuilder or tool builder permanently records the required information on the tooling in question, irrespective of whether a UCC financing statement is filed.  However, the balance of subsection 3 of each statute describes not only the information that must be inscribed on the tool as "required," but also describes the financing statement under subsection 2 as "required."   Subsection 3 then goes on to say that the information "required" to be inscribed and the "required" financing statement  "shall constitute actual and constructive notice" of the lien.  This language seems to say that *both* the inscription under subsection 1 and the financing statement under subsection 2 are "required" to provide "actual and constructive notice" of the lien.  This is Ford's position, bolstered by the mandatory term "shall" that appears in both subsections 1 and 2 of each statute.

Subparagraph 4 injects an additional element of doubt in construing the statutes by providing that the lien "attaches when actual or constructive notice is received."  The problem caused by this language is that under subsection 3, the references to the information required to be inscribed on the tooling and the financing statement required to be filed are written with the conjunctive *and*, which suggests that both acts together constitute actual and constructive notice of the lien.  However, subsection 4 arguably calls this construction into question by using the disjunctive *or* between "actual" and "constructive" notice.  The disjunctive *or* in this sentence suggests that there might be actual notice without constructive notice and vice versa.  In other words, if the lien can attach when there is only the actual notice provided by the inscription on the tooling, does this mean that attachment can occur without the constructive notice that a UCC financing statement provides?

Similarly, if there is only a UCC financing statement that provides the constructive notice, can attachment occur without the actual notice that is provided by the inscription on the tooling? These questions seem to support H.S. Die's contention that only one *or* the other of permanent inscription or UCC financing statement is necessary. According to H.S. Die's reading, subsection 4 clarifies that attachment occurs when either actual *or* constructive notice is received, thereby reinforcing its position that the lien is enforceable so long as the toolmaker has *either* inscribed the information on the tooling or filed a UCC financing statement.

However, there are several difficulties with H.S. Die's reading of the statutes. First, it cannot be reconciled with the mandatory term "shall" that appears both in subsection 1 for inscription on the tooling and in subsection 2 for filing the financing statement. Second, it cannot be harmonized with subsection 3's language that refers to both the permanent inscription as "required" and to the financing statement as "required," and continues on to read as though both of those two acts together "constitute actual and constructive notice" of the lien. Third, H.S. Die's construction of the statutes is inconsistent with subsection 5. That subsection of each of the statutes provides that "the lien remains valid" until the first of three events takes place. One of those events in subsection 5(c) is that "the financing statement is terminated." If H.S. Die is correct that the lien exists and is enforceable even without a financing statement, based solely on permanent inscription on the tooling, how could the termination of a financing statement affect the validity of the lien? Stated another way, if permanent inscription on the tooling itself is enough to obtain and enforce a lien, what should it matter that a financing statement has been terminated? The provision in subsection 5(c), stating that the lien is no longer *valid* once a financing statement is terminated, supports Ford's position that the filing of a financing statement in accordance with subsection 2 of each statute is

one of two separate and independent requirements under these statutes, instead of an alternative method to obtain and enforce a lien.

Unfortunately, these two statutes are not clearly written. They each begin with two subparagraphs, each mandating the performance of a separate act, and then a third subparagraph that begins by referring only to one of these acts but concludes by stating that actual and constructive notice of the lien occurs only upon performance of both of these "required" acts. Having linked these two "required" acts together in subparagraph 3, subparagraph 4 of each of the statutes inexplicably uses the disjunctive *or*. Nonetheless, subsection 5 then goes on to clearly provide that the lien is no longer *valid* once a financing statement has been terminated, thereby supporting the notion that the financing statement as well as permanent inscription on the tooling is necessary to obtain and enforce a lien under these statutes. On the one hand, Ford's reading of these statutes would import "and subsection (2)" into the first sentence of subsection 3. It would also require changing "or" to "and" in the first sentence of subsection 4. On the other hand, H.S. Die's reading would require changing "shall" to "may" in subsections 1 and 2, disregarding the term "required" as used in subsection 3, and ignoring the provision in subsection 5(c) that terminates the lien's validity once the financing statement is terminated.

In order to decide Ford's motion, the Court must determine the requirements of the two statutes under which H.S. Die asserts its liens. "If the language of the statute is clear, then the inquiry is complete, and the court should look no further." Brilliance Audio, Inc. v. Haights Cross Communications, Inc., 474 F.3d 365, 372 (6th Cir. 2007) (citing Tenn. Valley Auth. v. Hill, 437 U.S. 153, 185 n.29 (1978)). An unambiguous statute ends the Court's inquiry. Chrysler Corp. v. Commissioner, 436 F.3d 644, 654 (6th Cir. 2006) (internal quotation marks and citations omitted).

-13-

An ambiguity arises when there are two plausible readings of a statute. <u>Brilliance Audio v. Haights Cross Communications</u>, 474 F.3d at 371-72. "Only if the statute is 'inescapably ambiguous' should a court look to other persuasive authority in an attempt to discern legislative meaning." <u>Id.</u> at 371 (quoting <u>Garcia v. United States</u>, 469 U.S. 70, 76 n.3 (1984)).

The Court concludes that the two statutes are open to two plausible readings, and thus are inescapably ambiguous. "When faced with statutory sections that are inherently inconsistent, [the Court's] first duty is to reconcile the competing provisions so that they can both remain in effect." <u>Schmitt v. City of Detroit</u>, 395 F.3d 327, 330 (6th Cir. 2005) (citations omitted). "[F]acially ambiguous provisions can have their meanings clarified and rendered unambiguous by reference to the statute's structure or to other unambiguous terms in the statute." <u>Bower v. Federal Express Corp.</u>, 96 F.3d 200, 208-09 (6th Cir. 1996) (citations omitted). Other sources of clarification are legislative history, interpretations by other courts, or secondary sources. <u>See</u> <u>Chrysler Corp. v. Commissioner</u>, 436 F.3d at 654 ("Only when our reading results in ambiguity or leads to an unreasonable result, may we look to the legislative history."); <u>Brilliance Audio v. Haights Cross Communications</u>, 474 F.3d at 372 (listing other sources of persuasive authority when faced with an ambiguous statute).

Looking first to legislative history, as to both statutes, the parties did not cite to, nor could the Court locate any, helpful legislative history.[2] Turning next to case law, there are only two

---

[2] The Michigan House and Senate Fiscal Agencies both published legislative analyses of each statute. However, other than citing the need to provide additional protection for moldbuilders and special tool builders, the analyses simply summarize the contents of the proposed legislation. <u>See</u>, <u>e.g.</u>, Mich. House Fiscal Agency Legislative Analysis, H.R. 5993, 91st Leg. Reg. Sess. (May 8, 2002) (Special Tools Lien Act); Mich. Senate Fiscal Agency Bill Analysis, H.R. 4812, 91st Leg. Reg. Sess. (Feb. 6, 2002) (Moldbuilders Lien Act).

-14-

published decisions and one unpublished decision that have discussed either of the two statutes. In the unpublished opinion Easom Automation Systems, Inc. v. Thyssenkrupp Fabco, Corp., No. 06-14553, 2007 WL 2875256 (E.D. Mich. Sept. 28, 2007), the U.S. District Court for the Eastern District of Michigan addressed a special tool builder's complaint for immediate possession of special tools under the Special Tools Lien Act. In asserting its right to possession, the plaintiff argued that it had complied with the Special Tools Lien Act by both affixing its name and address on the tools and filing a financing statement. Id. at *2. Issues of fact prevented the court from deciding whether the Special Tools Lien Act even applied, so the court did not address the requirements under the act. Id. at *4. In Buffalo Molded Plastics, Inc. v. Plastic Mold Technology, Inc. (In re Buffalo Molded Plastics, Inc.), 354 B.R. 731 (Bankr. W.D. Penn. 2006), the court examined the Moldbuilders Lien Act in dictum. In that case, the court ultimately decided a tooling lien dispute under Pennsylvania law, based on conflict of law rules, but noted in passing that under Michigan's Moldbuilders Lien Act, tooling manufacturers must comply with both the identification and filing requirements. 354 B.R. at 751. A Michigan Court of Appeals case addressed the pre-2002 version of the Moldbuilders Lien Act, but the requirements of § 445.916 were not before the court. See Gateplex Molded Products, Inc. v. Collins & Aikman Plastics, Inc., 681 N.W. 2d 1 (Mich. Ct. App. 2004). The limited case law that exists does not help decide Ford's motion.

As for secondary sources, several articles have recognized the ambiguity in both statutes, but none have suggested a definitive or persuasive way to reconcile the two conflicting interpretations. See Joseph J. DeVito, Extending Credit to Automotive Suppliers in the Era of Contractual Termination for Convenience, Mich. Bus. L.J. 49, 43-55 (Spring 2006); Willard Hawley, Michigan Toolmakers' and Moldbuilders' Liens: Practical Considerations, Mich. Bus. L.J., 44, 45 (Fall 2006);

Dennis W. Loughlin, <u>Turning the Screws: Rights Under the Michigan Special Tools Lien Act</u>, Mich. Bus. L.J. 26, 26-30 (Spring 2003); John T. Gregg, <u>An Introduction to Tooling Liens in the Automotive Industry (Part I)</u>, Am. Bankr. Inst. J. 28, 28-29, 81 (June 2009); John T. Gregg, <u>An Introduction to Tooling Liens in the Automotive Industry (Part II)</u>, Am. Bankr. Inst. J. 36, 36-37, 74 (July/Aug. 2009); John T. Gregg, <u>Breaking the Mold: Subordination of Lenders' Blanket Liens Under Michigan's Special Tool Lien Act and Plastic Mold Lien Act</u>, 124 Banking L.J. 816, 816-822 (Oct. 2007).

With no authoritative or persuasive guidance from legislative history, case law or secondary sources, the Court is left to depend upon the structure of the statutes and any other unambiguous terms in the statutes. Neither statute contains a definitional or other provision that clarifies the ambiguities of the statutory provisions regarding recording information on the mold or tool, filing a financing statement, or actual and constructive notice. But in reviewing the statutes' structure and their unambiguous terms, in the context of the actions to be performed by a moldbuilder or tool builder, the words that immediately and plainly stand out are the words "shall" and "required." First, subsection 1 of each statute commands the moldbuilder or tool builder to permanently record certain information on the tooling in question. The language in subsection 1 is mandatory: a moldbuilder or tool builder "shall permanently record" the information. Second, subsection 2 of each statute commands the moldbuilder or tool builder to file a financing statement: the moldbuilder or tool builder "shall file a financing statement in accordance with the requirements of § 9502 of the Uniform Commercial Code." Both subsections 1 and 2 of each statute are mandatory. They are not permissive. Nor are they written in the disjunctive. In the overall structure of each provision under which the liens are granted, these two mandatory provisions appear first, further highlighting their

-16-

importance.  Moreover, subsection 3 of each statute refers to both the recording of information on the mold or tool and the filing of the financing statement as "required."  Use of the word *shall* "'normally create[s] an obligation impervious to judicial discretion.'"  <u>United States v. Young</u>, 424 F.3d 499, 507 (6th Cir. 2005) (quoting <u>Lexecon Inc. v. Milberg Weiss Bershad Hynes & Lerach</u>, 523 U.S. 26, 35 (1998)).

After examining the structure of both statutes, and their use of the unambiguous terms "shall" and "required," the Court is persuaded that Ford's construction of the ambiguities in the statutes is the better view.  The Court holds that both of these statutes require a two step process in order to obtain an enforceable lien:  the permanent recording of information on the mold or tool, and the filing of a financing statement in accordance with section 9502 of the UCC.  To adopt H.S. Die's interpretation would require the Court to ignore legislative imperatives.  The Court is convinced that Ford's reading of the statutes best reflects the intent of the Michigan legislature as manifested in the language of the statutes.

H.S. Die makes one last argument in support of its interpretation, based on policy.  H.S. Die argues that requiring both a permanent inscription on the tooling and the filing of a financing statement sets the bar too high.  H.S. Die contends that the policy of these statutes is to create protections to ensure that moldbuilders and tool builders get paid.  H.S. Die views the double requirement of both permanent inscription *and* filing a financing statement as inconsistent with that policy.  Even accepting that the purpose of the statutes is to protect moldbuilders and tool builders, any policy considerations cannot alter the statutory requirements that both permanent inscription *and* the filing of a financing statement must occur in order for a moldbuilder or tool builder to obtain and be able to enforce a lien under either of these two statutes.  Nor does the Court consider these

requirements to be unduly onerous.  Until it was amended in 2002, the Moldbuilders Lien Act provided only for a possessory lien.  The Special Tools Lien Act did not exist until 2002.  By granting non-possessory liens, the tool makers covered by these two statutes received new rights to enforce payment that they did not previously have.  The dual requirements, that there be both a permanent inscription on the tooling and the filing of a financing statement, are not too burdensome in view of the fact that toolmakers covered by these acts may now enjoy the benefit of a non-possessory lien, in addition to a possessory lien, that attaches and is enforceable without execution of a security agreement by any party.

Having determined that the two tooling statutes each require both a permanent inscription on the tooling and the filing of a UCC financing statement, the next issue becomes whether the financing statements filed by H.S. Die are insufficient as a matter of law so that counts I through III of its complaint must be dismissed.  Ford argues that H.S. Die's financing statements are "seriously misleading" and thus do not operate to perfect H.S. Die's liens.  According to the complaint, H.S. Die filed 13 UCC financing statements between February 17, 2006 and August 14, 2008.  Ford contends that all but one of these financing statements incorrectly listed Plastech Automotive Components, Inc. ("PAC") as the name of the debtor.  According to Ford, Plastech Engineered Products, Inc. was the correct name of the debtor.  Moreover, Ford argues that PAC automatically dissolved on July 15, 2007.  Therefore any financing statement filed after that date with PAC identified as the debtor was defective for this reason as well.  Ford relies on two provisions of Article 9 of the Michigan UCC – § 440.9502, governing the sufficiency of a debtor's name on a

financing statement, and § 440.9506, providing that an insufficient name is seriously misleading.[3]

H.S. Die has a two-part response. First, H.S. Die counters that both tooling lien statutes incorporate Mich. Comp. Laws Ann. § 440.9502, (requiring the filing of a financing statement in accordance with the requirements of that section), but *only* § 440.9502. According to H.S. Die, any other provisions of Article 9, such as those provisions governing what makes a financing statement valid, are not incorporated in the two tooling statutes and are therefore not relevant. Second, H.S. Die argues that, even if other parts of Article 9 of the UCC are relevant to the validity of a financing statement filed under the tooling lien statutes, its financing statements were not seriously misleading. According to H.S. Die, in most instances, the correct debtor was named initially or by a later amendment. In other instances, it was either unclear to H.S. Die which of the Debtor entities they were doing business with because different names appeared on different documents, or H.S. Die was led to believe that it was doing business with one entity, when it was actually doing business with another.

H.S. Die is correct that the only reference to Article 9 of the UCC in the two tooling lien statutes is contained in subsection 2 of those statutes, each of which refers to the filing of "a

---

[3] Ford also asserts in its motion that H.S. Die violated § 362(a)(5) of the Bankruptcy Code by filing one financing statement five days after the petition date. That section of the Code stays any act to perfect a lien against property of the debtor, to the extent the lien secures a pre-petition claim. As a consequence, Ford argues that H.S. Die's attempt to "perfect its lien is invalid and void." H.S. Die argues in its response that, due to the extended PPAP process for testing tools, the date that title to the specific tools passed to the Debtor is unclear. In addition, H.S. Die argues that it had up to 30 days under § 362(b)(3) to file a financing statement from the date of the transfer of title. Neither Ford nor H.S. Die addressed this issue at the hearing on Ford's motion. At this early stage in the adversary proceeding, the Court concludes that the complaint states a plausible claim, sufficient to survive Ford's Rule 12(b)(6) motion to dismiss, without prejudice to the rights of the parties to later address the effect of § 362 on the post-petition filing of the financing statement.

financing statement in accordance with the requirement of section 9502" of the Michigan UCC. Mich. Comp. Laws Ann. § 445.619(2) and § 570.563(2). But to accept H.S. Die's first argument, and to read the tooling lien statutes in a vacuum, excluding all other provisions addressing financing statements, raises obvious difficulties. For example, there are many requirements in section 9502. Some of the requirements (e.g., that the financing statement provide the name of the debtor) can only be measured by applying other sections of the UCC (e.g., 9503 provides *how* to state the name of the debtor). Further, subsection 5 of both tooling lien statutes provides that the lien remains valid until the occurrence of certain events. One of those events is when "[t]he financing statement is terminated." Neither tooling lien statute provides an explanation of how a financing statement is *terminated*. With no guidance from the tooling lien statutes, where else but Article 9 of the UCC would contracting parties or a court look to determine if and when a "financing statement is terminated"? There simply is no other body of law that appears to be applicable or even helpful. In addition, the provisions of Article 9 concerning the sufficiency of financing statements are universally relied upon in commercial transactions, and are a throughly developed and widely recognized area of the law. Resort to the few sections of Article 9 that would assist the Court in determining the sufficiency of a financing statement does not require the wholesale incorporation of *all* provisions of Article 9 into the tooling lien statutes. The Court rejects H.S. Die's argument that §§ 440.9503 and 440.9506 are not relevant to the issue of the sufficiency of H.S. Die's financing statements.

Mich. Comp. Laws Ann. § 440.9503(1) governs the sufficiency of the name of the debtor and the secured party. If the debtor is a registered organization, a financing statement sufficiently provides the name of the debtor only if the name is "the name of the debtor indicated on the public

-20-

record of the debtor's jurisdiction of organization which shows the debtor to have been organized."

§ 440.9503(1)(a). Section 440.9506 governs the effect of errors or omissions on financing

statements. If a financing statement "substantially" satisfies the requirements, it "is effective, even

if it has minor errors or omissions, unless the errors or omissions make the financing statement

seriously misleading." § 440.9506(1). The name of the debtor is critical to the sufficiency of a

financing statement. "Whether a name is 'seriously misleading' is significant because financing

statements are indexed according to the debtor's name." Continental Oil Co. v. Citizens Trust &

Savings Bank, 244 N.W.2d 243, 244 (Mich. 1976) (footnotes omitted). Accordingly, "a financing

statement that fails sufficiently to provide the name of the debtor in accordance with section 9503(1)

is seriously misleading." Mich. Comp. Laws Ann. § 440.9506(2).

In applying these provisions, it is important to remember that this matter is now before the

Court on a motion to dismiss under Rule 12(b)(6), and the Court has excluded matters outside the

pleadings. In paragraphs 38 and 48 of the complaint, in counts I and II, respectively, H.S. Die

alleges that it filed UCC financing statements as required by the tooling lien statutes. The Court

"must construe the complaint in the light most favorable to the plaintiff, [and] accept all the factual

allegations as true." Bovee v. Coopers & Lybrand C.P.A., 272 F.3d 356, 360 (6th Cir. 2001)

(citations omitted). An issue arises concerning the sufficiency of H.S. Die's financing statements

only when matters outside the pleadings are considered. In addition, in refuting Ford's argument,

H.S. Die points to other documents that it believes will establish that the correct debtor's name did

appear on the financing statements and, if the wrong name appeared, that H.S. Die corrected the

name or was misled as to the correct debtor's name. The Court is persuaded that the complaint

plausibly states a claim for relief with respect to H.S. Die's assertion of lien rights in the subject

tooling.  Therefore, the Court will deny Ford's motion to dismiss counts I - III.

## VI.  <u>Dismissal of Count IV</u>

Count IV seeks to enforce the Ford Payment Order.  Ford argues that the Ford Payment Order does not give H.S. Die a private right of action.  Specifically, Ford asserts that H.S. Die may only seek to enforce the Ford Payment Order by filing a motion in the main bankruptcy case. However, counsel for Ford admitted at the hearing on the motion to dismiss that Ford will not be disadvantaged or prejudiced by having to address enforcement of the Ford Payment Order in an adversary proceeding, with the heightened procedural safeguards that it contains.  Because of the overlapping factual basis needed to determine the parties' rights to the tooling and H.S. Die's right to payment, it makes no sense to carve out just this one matter from this adversary proceeding, only to require H.S. Die to file a separate motion to raise it as a contested matter, which would be set on a parallel track with the adversary proceeding in any event.  The Court concludes that H.S. Die states a claim for relief under the Ford Payment Order which, under these circumstances, the Court finds is properly raised in this adversary proceeding.  Ford's motion to dismiss count IV is denied.

## VII.  <u>Dismissal of Count V</u>

Count V is based on unjust enrichment.  Ford issued purchase orders to the Debtor for the production of parts for various Ford programs.  In order to produce the parts, the Debtor needed specialized tooling.  The complaint alleges that Ford  "authorized" the Debtor to contract with a third party.  The Debtor then allegedly issued tooling purchase orders "for itself and on behalf of" Ford  to H.S. Die.  Further, the complaint alleges that Ford would ultimately pay the purchase price and become the owner of the tooling.  H.S. Die characterizes the payments from Ford to the Debtor as "pass-through" payments, with the understanding that the ultimate recipient of the payments

-22-

would be H.S. Die. Having received the benefit of the tooling made by H.S. Die but without making the pass-through payments, H.S. Die alleges in count V that Ford has been unjustly enriched.

Ford argues that a claim for unjust enrichment is ordinarily treated by the courts as being based on an implied contract. Ford points out that there is no cause of action for unjust enrichment when there is an express contract between the parties that covers the subject matter of the unjust enrichment claim. According to Ford, because H.S. Die alleged an express contract among it, Ford and the Debtor, that H.S. Die would make the tools for Ford and Ford would pay H.S. Die by pass-through payments to the Debtor, H.S. Die is precluded from also suing on an implied contract. H.S. Die counters that the "express contracts" in this instance were the purchase orders between the Debtor and H.S. Die. There was no privity of contract between H.S. Die and Ford. Therefore, H.S. Die argues that it may also state a claim for unjust enrichment against Ford.

Ford is correct that, in Michigan, "the law will imply a contract in order to prevent unjust enrichment. 'However, a contract will be implied only if there is no express contract covering the same subject matter.'" Convergent Group Corp. v. County of Kent, 266 F. Supp.2d 647, 661 (W.D. Mich. 2003) (quoting Barber v. SMH (US), Inc., 509 N.W.2d 791, 796 (Mich. Ct. App. 1993)). In its complaint, H.S. Die is seeking payment for the tooling it manufactured under the purchase orders from the Debtor. Although H.S. Die characterizes the payments from the Debtor as "pass-through" payments, where Ford "expected to pay" H.S. Die, that obligation is not alleged to be in the purchase orders. There are no purchase orders between Ford and H.S. Die, even if all three parties may have understood that Ford was to become the eventual owner of the tooling. In these circumstances, where there is no express contract alleged between H.S. Die and Ford but only an express contract alleged between H.S. Die and the Debtor, the Court holds that H.S. Die is not precluded from suing

-23-

Ford based on the doctrine of unjust enrichment. Count V properly states a claim upon which relief may be granted.

## VIII. Conclusion

For the reasons set forth in this opinion, the Court holds that each count of H.S. Die's complaint does state a claim for which relief may be granted. Therefore, the Court denies Ford's Rule 12(b)(6) motion to dismiss. The Court will enter a separate order consistent with this opinion.

**For publication**

Signed on October 27, 2009

```
          /s/ Phillip J. Shefferly
     Phillip J. Shefferly
     United States Bankruptcy Judge
```